# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

ROGELIO VELA JR.,
        *Defendant-Appellant.*

No. 08-50121

D.C. No.
3:07-cr-00993-
DMS-1

OPINION

Appeal from the United States District Court
for the Southern District of California
Dana M. Sabraw, District Judge, Presiding

Argued and Submitted
April 15, 2009—Pasadena, California

Filed October 26, 2010

Before: William C. Canby, Jr., Johnnie B. Rawlinson, and
N. Randy Smith, Circuit Judges.

Opinion by Judge Canby;
Dissent by Judge N.R. Smith

17773

## COUNSEL

Todd W. Burns, Federal Defenders of San Diego, Inc., San Diego, California, for the defendant-appellant.

George D. Hardy, Assistant United States Attorney, San Diego, California, for the plaintiff-appellee.

## OPINION

CANBY, Circuit Judge:

Rogelio Vela Jr. ("Vela") appeals from a judgment of not guilty by reason of insanity following a jury trial on a charge of assault on a federal officer, in violation of 18 U.S.C. § 111. He contends that the district court erred in failing to dismiss the indictment, refusing to instruct the jury that willfulness is

an element of § 111, and denying him the opportunity to present a diminished capacity defense. He contends that, as a result, he was denied an opportunity for an outright acquittal rather than a verdict of not guilty by reason of insanity, which results in civil commitment. *See* 18 U.S.C. § 4243. We conclude, over the government's opposition, that we have jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291. We affirm the district court's judgment.

## BACKGROUND

On the evening of March 22, 2007, in the San Ysidro, California, Port of Entry security office, Vela stabbed Customs and Border Protection Branch Chief Patrick Wright in the chest with a knife. The stabbing occurred after Officer Wright and Vela, who is deaf, exchanged a series of notes concerning Vela's fear that both the Mafia and his family wanted him dead, and Vela's own declaration that he intended to kill himself. Officer Wright was severely injured, but survived.

A federal grand jury returned a two-count indictment, charging Vela in Count 1 with attempted murder in violation of 18 U.S.C. § 1114 and in Count 2 with assault on a federal officer in violation of 18 U.S.C. §§ 111(a)(1) and (b). Count 1 eventually was dismissed on the government's motion, so only Count 2 is at issue on appeal. Count 2 originally charged Vela with "willfully" assaulting Officer Wright while Wright was performing his official duties. Subsequently, the grand jury returned a superseding indictment that replaced "willfully" with "intentionally."[1]

---

[1]Count 2 of the superseding indictment charged that Vela "did intentionally and forcibly assault, resist, oppose, impede, and interfere with a person [designated in the act] in that [Vela] stabbed Officer Wright in the chest with a deadly and dangerous weapon . . . and did thereby inflict bodily injury upon Officer Wright, while Officer Wright was engaged in the performance of his official duties."

Vela filed several pretrial motions, three of which are the concern of this appeal. First, Vela filed a motion to dismiss the superseding indictment because Count 2 failed to charge a required element of willfulness.[2] Second, Vela filed a motion to be allowed a defense of diminished capacity to the Count 2 charge. Finally, Vela moved to dismiss Count 2 on the ground that § 111(b), the assault statute, unconstitutionally required the court, rather than the jury, to find aggravating facts that increased the authorized sentence, in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The district court denied all three motions.

Vela proceeded to trial asserting an insanity defense, supported by expert testimony. The government proffered its own expert witness who testified that Vela was not legally insane, but only "severely depressed" at the time of the incident. After a three-day trial, the jury found Vela not guilty by reason of insanity. The district court ultimately ordered Vela committed to the custody of the Attorney General for placement in a suitable mental facility, pursuant to 18 U.S.C. § 4243(e). Vela timely appealed the judgment.

## JURISDICTION

Before proceeding to the merits of Vela's appeal, we first address the government's contention that we lack jurisdiction because there is no final judgment from which Vela can appeal. The government also asserts that Vela is not entitled to appeal the verdict that accepted Vela's affirmative defense of insanity.

[1] "The right of appeal . . . is purely a creature of statute; in order to exercise that statutory right of appeal one must come within the terms of the applicable statute—in this case,

---

[2]The relevant motions are listed here in the order in which we will address them, not the order in which they were presented in the district court.

28 U.S.C. § 1291." *Abney v. United States*, 431 U.S. 651, 656 (1977). Section 1291 grants us jurisdiction to review "all final decisions of the district courts." 28 U.S.C. § 1291.

**[2]** The government argues that there has been no final decision in this case because Vela was found not guilty by reason of insanity, with the result that there has been no criminal conviction and sentence. The government relies on statements from decisions of this court and the Supreme Court to the effect that "[i]n a criminal case the [final judgment] rule prohibits appellate review until conviction and imposition of sentence." *Flanagan v. United States*, 465 U.S. 259, 263 (1984); *see also United States v. Montalvo*, 581 F.3d 1147, 1150 (9th Cir. 2009) ("In criminal cases, a final decision is rendered upon imposition of the defendant's sentence."). None of the cases making such statements, however, considered whether appellate jurisdiction lies in the unusual case where a criminal defendant is aggrieved by a verdict of not guilty by reason of insanity, which, by its nature, is not followed by a sentence.[3] We conclude in this matter of first impression that, when a defendant is found not guilty by reason of insanity, the lack of a sentence does not necessarily preclude appellate jurisdiction.

**[3]** First, both this court and the Supreme Court repeatedly have emphasized that, as a general matter, finality coincides with the termination of the criminal proceedings. We have explained that "[u]nder the modern doctrine, a ' "final decision" generally is one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.' " *United States v. Ray*, 375 F.3d 980, 985 (9th Cir.

---

[3]We also note that this court has suggested, in another context, that the requirement of a sentence for final judgment is not absolute. In *Phillips v. Vasquez*, 56 F.3d 1030 (9th Cir. 1995), we observed that "the Supreme Court has explicitly rejected the notion that final judgment always means sentence when . . . the conviction and sentencing procedures are bifurcated." *Id.* at 1033 n.2 (citing *Brady v. State of Maryland*, 373 U.S. 83, 85 n.1 (1963)).

2004) (quoting *United States v. One Ford Pickup*, 56 F.3d 1181, 1184 (9th Cir. 1995) (per curiam); *see also Midland Asphalt Corp. v. United States*, 489 U.S. 794, 798 (1989). And, in *Sell v. United States*, 539 U.S. 166 (2003), the Supreme Court recognized that "the term 'final decision' normally refers to a final judgment, such as judgment of guilty, *that terminates a criminal proceeding*." *Id.* at 176 (emphasis added).[4]

[4] When a criminal defendant is found guilty, it is unremarkable that there is no final judgment until the defendant is sentenced; it is only at sentencing that the criminal action terminates and "nothing [is left] for the court to do but execute the judgment." *Midland Asphalt*, 489 U.S. at 798 (citation omitted); *see also, e.g.*, *Berman v. United States*, 302 U.S. 211, 212 (1937) ("To create finality it was necessary that petitioner's conviction should be followed by sentence . . . ."). But when, as in Vela's case, a jury finds a criminal defendant not guilty by reason of insanity, the docketing of the verdict amounts to a final judgment because the criminal proceeding has come to an end and no criminal sentence will follow.[5] *See United States v. Stewart*, 452 F.3d 266, 272 (3d Cir. 2006) ("[T]he judgment of acquittal solely by reason of insanity has

---

[4]Of course, this rule of finality is not absolute. Under the collateral order doctrine first announced in *Cohen v. Beneficial Indus. Loan Corp.* 337 U.S. 541, 546-47 (1949), we are permitted to consider the appeal of an order apart from a final judgment provided that it "(1) conclusively determines the disputed question; (2) resolves an important issue completely separate from the merits of the action; and (3) is effectively unreviewable on appeal from a final judgment." *United States v. Pace*, 201 F.3d 1116, 1119 (9th Cir. 2000) (citation and internal quotation marks omitted). In light of our conclusion that a verdict of not guilty by reason of insanity is a final judgment subject to appeal, we need not consider Vela's alternate argument that we have jurisdiction under the collateral order doctrine.

[5]Subsequent commitment proceedings under 18 U.S.C. § 4243 are of a civil, not criminal, nature. *See, e.g.*, *United States v. Budell*, 187 F.3d 1137, 1141 (9th Cir. 1999) (citing *United States v. Baker*, 45 F.3d 837, 842-43 (4th Cir.), *cert. denied*, 516 U.S. 872 (1995)).

conclusively resolved the underlying criminal proceedings.”); *State v. Marzbanian*, 198 A.2d 721, 724 (Conn. 1963) (“[I]t is not correct to say that because no sentence had been pronounced there is no final judgment from which an appeal may be taken. A judgment was rendered in this case, as it must be in every case which terminates in a finding after a trial on the facts . . . .”); *cf. Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. at 546 (explaining that the term “final decision” is to be given a “practical rather than a technical construction”). Thus, we conclude that appellate review of proceedings culminating in a verdict of not guilty by reason of insanity accords with our prior decisions and those of the Supreme Court.

**[5]** Moreover, appellate review in cases ending with verdicts of not guilty by reason of insanity is consistent with the primary rationale underlying the final judgment rule that courts of appeal should avoid “piecemeal appellate review of trial court decisions which do not terminate the litigation.” *Flanagan*, 465 U.S. at 264 (citation and internal quotation marks omitted); *see also Ray*, 375 F.3d at 985 (“The foundation of [the final judgment rule] is not in merely technical conceptions of ‘finality.’ It is one against piecemeal litigation.” (citation omitted)). As the Supreme Court has explained, the general rule that requires parties “[to] raise all claims of error in a single appeal following final judgment on the merits,” *Flanagan*, 465 U.S. at 263 (quoting *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 374 (1981)), not only “minimiz[es] appellate-court interference with the numerous decisions [trial judges] must make in the pre-judgment stages of litigation,” but also “reduces the ability of litigants to harass opponents and to clog the courts through a succession of costly and time-consuming appeals,” *id.* at 263-64. In criminal cases, the policy against piecemeal appellate review is at its strongest because of the interests of the defendant, the prosecution, and society in promptly bringing a criminal case to trial. *Id.* at 264.

Permitting Vela to appeal from a verdict of not guilty by reason of insanity raises none of these concerns. His case is

over; an appeal cannot interfere with or delay the progress of his criminal trial. It will not lead to multiple appeals. Thus, the rationales underlying the final judgment rule render appellate jurisdiction appropriate here.

We also reject the government's suggestion that it is improper to permit an appeal by a defendant who prevailed in his defense of insanity. The cases relied upon by the government do not support that proposition. In *United States v. Wattleton*, 296 F.3d 1184 (11th Cir. 2002), the defendant had appealed a conviction and sought and obtained a reversal with instructions to enter a verdict of not guilty by reason of insanity. He later challenged that verdict in an appeal of his resulting civil commitment, arguing that the defense of insanity had been imposed on him by the government. *Id.* at 1194. The court of appeals addressed that contention on the merits and held that there had been no such imposition. *Id.* at 1194-96. In *Curry v. Overholser*, 287 F.2d 137 (D.C. Cir. 1960), a convicted defendant similarly succeeded on appeal and remand in obtaining the verdict that he sought: not guilty by reason of insanity. *Id.* at 138. He challenged that verdict in subsequent civil commitment proceedings. *Id.* at 138-39. The court of appeals held that he could "not now be heard to complain of the consequences of" his decision to seek the insanity verdict. *Id.* at 140.

We note first that neither of these cases raised a jurisdictional question, because they both arose in challenges to subsequent civil commitment, not in appeals from verdicts of not guilty by reason of insanity. The rulings appear to proceed on a theory akin to estoppel where the defendants asked for the verdicts that they later attacked. But in both *Wattleton* and *Curry*, the defendants had never sought any verdict other than not guilty by reason of insanity, and that is the verdict they attempted to challenge. Vela, on the other hand, is not directly attacking his verdict of not guilty by reason of insanity; he is arguing that errors were made in the district court that deprived him of a proper opportunity to be freed entirely from

his indictment, or to succeed in a defense leading to an uncon-ditional verdict of not guilty.[6] He contends that his ultimate resort to an insanity defense is not inconsistent with his claims presented on appeal. The record supports his contention.

[6] One month after Vela was indicted, he moved the dis-trict court to permit diminished capacity defenses to both attempted murder (Count 1) and assault (Count 2). The gov-ernment filed an opposition and Vela filed a notice indicating that he "anticipate[d] relying on *either* the insanity defense, *and/or* 'intends to introduce expert evidence relating to a mental disease or defect or . . . other mental condition.' " (emphasis added). The district court ruled that he could assert a diminished capacity defense to attempted murder, but not assault. Only after the government dismissed the attempted murder charge, and after the denial of his renewed motion to permit a diminished capacity defense to assault, did Vela acknowledge that he was "stuck" with insanity as a defense. Under the circumstances, we are unpersuaded that Vela is estopped because he "was given exactly what he had asked the District Court to give him." *Curry*, 287 F.2d at 140. Vela is challenging errors quite apart from the verdict of not guilty by reason of insanity. It is both appropriate and efficient that he be entitled to raise those issues on this appeal.[7]

---

[6]For this reason, the remedy of a challenge to his civil commitment, to which the dissent here would confine Vela, is insufficient. He is not chal-lenging the terms of that commitment, as the appellant did in *Stewart*, 452 F.3d at 274, nor the verdict of not guilty by reason of insanity, as the habeas petitioner tried to do in *Curry*, 287 F.2d at 138-39. Vela is raising issues related to his criminal trial that may be difficult or impossible to address in a proceeding to challenge his civil commitment.

[7]We see no reason why, as the dissent here urges, Vela must forfeit the challenges he now seeks to raise because, after his positions were rejected in the district court, he pursued and obtained a verdict of not guilty by rea-son of insanity. Nor do we agree that permitting an appeal after the rela-tively rare verdict of not guilty by reason of insanity will lead to the dire consequences predicted by the dissent. We doubt, for example, that it will encourage defendants to seek a "re-do" of a damaging cross-examination. *See* dissent, *infra* p. 17799.

**[7]** We conclude, therefore, that there are no barriers, juris-dictional or prudential, to the entertainment of Vela's appeal as an appeal from a final judgment under 28 U.S.C. § 1291.[8] We proceed, therefore, to address Vela's contentions of error.

## MERITS

### I.  Standards of Review

We review de novo a district court's denial of a motion to dismiss an indictment. *United States v. Rivera-Sillas,* 417 F.3d 1014, 1017 (9th Cir. 2005). We also review de novo whether a jury instruction fails to state the elements of a statu-tory crime, *United States v. Gravenmeir*, 121 F.3d 526, 528 (9th Cir. 1997), whether diminished capacity is a defense to a charged offense, *United States v. Twine*, 853 F.2d 676, 678 (9th Cir. 1988), and whether a statute is facially unconstitu-tional under *Apprendi*, *United States v. Salazar-Lopez*, 506 F.3d 748, 750 (9th Cir. 2007).

### II.  Vela's Motions to Dismiss the Indictment, Instruct the Jury on Willfulness, and Permit a Diminished Capacity Defense Were Properly Denied

**[8]** Three of Vela's contentions on the merits are interre-lated and amount to an attempt to convince this court that § 111 requires a heightened *mens rea* for conviction. Accord-ing to Vela, § 111 requires proof of an element of willfulness —which Vela understands to mean a "bad purpose"—and he

---

[8]The dissent here states that we have left unanswered the question of what happens to an earlier verdict of not guilty by reason of insanity if a defendant appeals as Vela has, wins on appeal, but on remand the jury subsequently rejects his diminished capacity defense. *See* dissent, *infra* p. 17797-98 n.3.

We have not answered the question the dissent poses because any answer we gave would be the purist dictum. A future panel that reverses and remands an appeal like Vela's can determine the effect to be given the earlier verdict in further proceedings. That question is not before us.

asserts that, consequently, § 111 must define a specific intent crime. Therefore, Vela argues, the indictment should have been dismissed for failure to allege willfulness. Or, at the very least, Vela insists that the district court erred by not permitting him to present a diminished capacity defense and by failing to instruct the jury that, to convict, it must find that he acted willfully. We conclude that none of these contentions have merit.

[9] Vela's arguments are foreclosed by our decision in *United States v. Jim*, 865 F.2d 211, 215 (9th Cir. 1989), where we held that § 111 is a general intent crime. The defendant in *Jim* was charged with three counts of violating § 111 arising from a drunken shooting spree. *Id.* at 212. The trial court refused to instruct the jury on the defense of voluntary intoxication. *Id.* On appeal, we affirmed the ruling on the ground that § 111 was a general intent crime, *id.* at 215, and voluntary intoxication is not a defense to a general intent crime, *id.* at 212.

[10] *Jim* controls this case. We have held that a defense of diminished capacity, like voluntary intoxication, is ordinarily available only when a crime requires proof of a specific intent. *Twine*, 853 F.2d at 679. *Jim* makes clear that § 111 defines a general intent, not a specific intent, crime. It follows from that conclusion that the district court here did not err in denying Vela's motion to dismiss the indictment for lack of an element of specific intent (as Vela defines "willfulness") or in refusing to permit or instruct the jury on a defense of diminished capacity.

Vela seizes upon the statement in *Jim* that the common-law crime of assault included an element of willfulness, and that, if congressional purpose is not considered, § 111 "appears to be a specific intent crime." 865 F.2d at 213. But *Jim* then conducted an analysis of congressional purpose and squarely held that this analysis led to the conclusion that "§ 111 is a general intent crime." *Id.* at 215. Vela simply misreads *Jim* in arguing

that it imposed a requirement of willfulness or any other element of specific intent upon § 111.[9]

Vela next contends that *Jim* must be limited to the holding that voluntary intoxication is not permitted as a defense to § 111, and that diminished capacity raises other considerations because it lacks the moral opprobrium of intoxication. *See Montana v. Egelhoff*, 518 U.S. 37, 50 (1996) (plurality opinion) (noting the "traditional view that an intoxicated criminal is not deserving of exoneration"). But nothing in *Jim*'s analysis of congressional purpose depended upon, or was limited to, the defense of voluntary intoxication. The conclusion that § 111 was a general intent crime necessarily precluded defenses aimed at a nonexistent element of specific intent. Indeed, at least three other circuits that have addressed the question have held that § 111 admits of no defense of diminished capacity. *See United States v. Kimes*, 246 F.3d 800, 809 (6th Cir. 2001); *United States v. Ricketts*, 146 F.3d 492, 498 (7th Cir. 1998); *United States v. Ettinger*, 344 F.3d 1149, 1158 (11th Cir. 2003). We have found no circuits to the contrary. Vela's construction of *Jim* is unsupportable.

Vela's last argument on this issue is that the authority of *Jim* has been undermined by later decisions of the Supreme Court or this court en banc. This contention faces a high hurdle. Only when "the reasoning or theory of our prior circuit

---

[9]Vela makes a related argument that, even if assault on a federal officer is a general intent crime, the other acts prohibited by § 111—resisting, opposing, impeding, intimidating, or interfering with a federal officer—are specific intent crimes. Thus, Vela claims that he was unconstitutionally prohibited from presenting a diminished capacity defense for purposes of the non-assault acts prohibited by the statute. We conclude, however, that *Jim*'s holding that § 111 is a general intent crime applies to all of the acts specified in § 111. *See Jim*, 865 F.2d at 214 (recognizing that because § 111 "prohibits in addition to assault, *resisting, impeding, intimidating, and interfering* with a federal officer" and "has a broader purpose than to deter assault . . . [a]pplying a general intent test well serves that purpose" (emphasis added)).

authority is clearly irreconcilable with the reasoning or theory of intervening higher authority [should a three-judge panel] consider itself bound by the later and controlling authority, and . . . reject the prior circuit opinion as having been effectively overruled." *Miller v. Gammie*, 335 F.3d 889, 892-93 (9th Cir. 2003) (en banc). None of the authorities relied upon by Vela meet this standard.

First, Vela argues that *Jim*'s "speculating as to Congress's intent" is inconsistent with the Supreme Court's decision in *United States v. Santos*, 128 S.Ct. 2020 (2008) (plurality opinion). In *Santos*, the Supreme Court, in a fractured opinion, held that because the word "proceeds," as used in the federal money-laundering statute, could mean either "receipts" or "profits," the ambiguity was resolvable only by application of the rule of lenity. *Id.* at 2025. The analysis in *Santos*, however, was necessarily specific to the words and purpose of the money-laundering statute, and we are not persuaded that this analysis can be applied directly to overcome *Jim*'s analysis of the totally different § 111. *Santos* does not so undermine the reasoning of *Jim* that we may depart from *Jim*'s holding that § 111 is a general intent crime.

The other two decisions relied upon by Vela are equally far afield. *Clark v. Arizona*, 548 U.S. 735 (2006), held in relevant part that Arizona did not violate due process of law by restricting mental capacity evidence to the defense of insanity and barring the use of such evidence to rebut the *mens rea* element of a crime. *Id.* at 764-71. We fail to see how this ruling aids Vela or undermines *Jim*.

The last case Vela relies on is our en banc decision in *United States v. Gracidas-Ulibarry*, 231 F.3d 1188 (9th Cir. 2000) (en banc), in which we reaffirmed that attempts were specific intent crimes at common law. *See id.* at 1191-92. Because one definition of common-law assault includes "a willful *attempt* to inflict injury upon the person of another," *Dupree*, 544 F.2d at 1051 (emphasis added), Vela argues that

*Jim*'s holding that § 111 is a general intent crime is irreconcilable with *Gracidas-Ulibarry*. We find no such irreconcilability. *Gracidas-Ulibarry* did not introduce any concepts that were not taken account of in *Jim*.[10] *Jim* quoted *Dupree*'s common-law definition of assault and opined that, without a consideration of congressional purpose behind § 111, it would seem that § 111 was a specific intent crime. *Jim*, 865 F.2d at 213. *Jim* went on, however, to consider congressional purpose and hold that § 111 defined a general intent crime. *Id.* at 215. Nothing in *Gracidas-Ulibarry*, which dealt with attempted illegal entry into the country, cast any doubt, explicitly or implicitly, on *Jim*'s construction of § 111. There is no inconsistency between the two decisions. We conclude, therefore, that *Jim* has not been undermined by subsequent decisions.

Accordingly, the district court did not err by denying Vela's motions to dismiss the indictment for failure to charge willfulness, to instruct the jury on willfulness, or to permit a diminished capacity defense.[11]

---

[10]The common-law meaning of attempt was settled law long before *Jim* was decided. *See Gracidas-Ulibarry*, 231 F.3d at 1192 (citing, *inter alia*, *Wooldridge v. United States*, 237 F. 775, 778-79 (9th Cir. 1916)).

[11]To avoid any misunderstanding of the scope of our ruling, we reject Vela's related contention that, if we were to agree with his assertion that he should have been allowed to present a diminished capacity defense, then we would have to order an acquittal. His reasoning is that the verdict of not guilty by reason of insanity necessarily means that the jury found him incapable of entertaining a specific intent. Accordingly, he argues, he must be unconditionally acquitted of any charge requiring specific intent. Carried to its extreme, Vela's argument would lead to the conclusion that no defendant charged with first degree murder could be held to a verdict of not guilty by reason of insanity. The insanity verdict would require an acquittal on the charge by negating premeditation and intent to kill.

No such assumption underlies our ruling. Vela's argument conflates two different potential jury findings. To reach a verdict of not guilty by reason of insanity, a jury first must find unanimously that the government has proved beyond a reasonable doubt all of the elements of the charged offense. *See, e.g., United States v. Southwell*, 432 F.3d 1050, 1054-55 (9th

### III.   18 U.S.C. § 111 Does Not Violate *Apprendi*

**[11]** Vela's final contention is that his conviction must be vacated because § 111 is facially unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 446 (2000). In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. At issue are the aggravating factors contained in § 111(b)— use of a deadly or dangerous weapon and infliction of bodily injury—which, if proven, increase the offense's maximum penalty to twenty years in prison.[12]

---

Cir. 2005). If the charge is of a specific intent defense, that intent must be proved beyond a reasonable doubt. A finding that this burden has been met is not necessarily inconsistent with a contemporaneous, unanimous finding by the jury that the defendant has proved by clear and convincing evidence that he was insane at the time of commission of the offense. We are satisfied that a jury could reasonably find that an insane person had a specific intent to commit a crime and yet was "unable to appreciate the nature and quality or the wrongfulness of his acts." 18 U.S.C. § 17(a). Accordingly, we reject Vela's contention that a finding of insanity *ipso facto* negates specific intent.

[12]At the time of Vela's offense, § 111 provided, in pertinent part:

(a) In general.—Whoever—

(1) forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated [in the act] while engaged in or on account of the performance of official duties . . .

shall, where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more than one year, or both, and in all other cases, be fined under this title or imprisoned not more than 8 years, or both.

(b) Enhanced penalty.—Whoever, in the commission of any acts described in subsection (a), uses a deadly or dangerous weapon (including a weapon intended to cause death or danger but that fails to do so by reason of a defective component) or inflicts bodily injury, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 111 (2007).

**[12]** Consistent with *Apprendi*, the indictment in this case charged the aggravating facts and the jury in this case was instructed that, to convict Vela under § 111(b), it must find that Vela "used a dangerous or deadly weapon and/or inflicted bodily injury" in committing the offense. Nonetheless, Vela argues that § 111 is facially unconstitutional because, even if the sentence-enhancing facts were found by the jury in his case, Congress *intended* that these factors be treated as sentencing factors and decided by the trial judge, not by the jury. Vela relies upon this court's pre-*Apprendi* holding in *United States v. Young*, 936 F.2d 1050 (9th Cir. 1991) (per curiam), that Congress in § 111 intended the factor of use of a deadly and dangerous weapon to be "strictly a sentencing provision" that need not be alleged in the indictment. *Id.* at 1054. Because we conclude that *Young*'s reasoning has been fatally undermined by subsequent decisions of the Supreme Court and our en banc court, we reject Vela's contention that § 111 violates *Apprendi*. *See Miller v. Gammie*, 335 F.3d 889, 892-93.

In concluding that Congress intended the deadly or dangerous weapon aggravator of § 111 to be a sentencing provision, rather than an essential element of the crime, the *Young* panel cited the facts that (1) the deadly or dangerous weapon provision "[was] not structurally separated from the rest of the section, indicating that the section contains only one substantive offense";[13] (2) the provision "[was] not drafted as a stand-

---

[13]At the time of Young's crime, § 111 did not contain the bodily injury aggravator. Further, § 111 was not structurally separated into subsections (a) and (b), as it was at the time of Vela's crime and it is today. Instead, § 111 provided:

> Whoever forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in [the act] while engaged in or on account of the performance of his official duties, shall be fined not more than $5,000 or imprisoned not more than three years, or both.

> Whoever, in the commission of such acts uses a deadly or dangerous weapon, shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

18 U.S.C. § 111 (1988); *see also Young*, 936 F.2d at 1053.

alone offense; it incorporates the predicate acts by reference rather than affirmatively setting forth any specific elements"; and (3) Congress, in later amending § 111 and dividing it into subsections (a) and (b), "[w]ithout otherwise materially altering the provision, . . . subsequently labeled the provision 'Enhanced Penalty.' " *Id.* at 1054. None of these rationales continues to hold water.

**[13]** To begin, *Young*'s reliance on the first two facts—the lack of structural separation between the primary offense and the deadly and dangerous weapon provision, as well as the deadly and dangerous weapon provision's incorporation by reference of the elements of the primary offense—is inconsistent with the Supreme Court's rationale in the more recent decision of *Jones v. United States*, 526 U.S. 227, 233 (1999). *Jones* considered Congress's intent in drafting the federal carjacking statute, 18 U.S.C. § 2119, which, similarly to § 111 as it presently stands, "begins with a principal paragraph listing a series of obvious elements," and that, "at first glance," the numbered subsections that follow appear to be only sentencing provisions. *Id.* at 232. The Court admonished, however, that the " 'look' of [a] statute . . . is not a reliable guide to congressional intentions" where the provisions in question "not only provide for steeply higher penalties, but condition them on further facts . . . that seem quite as important as the elements in the principal paragraph." *Id.* at 233.

Like the statute at issue in *Jones*, which increased the maximum penalty from fifteen years to either twenty-five years or life, *see id.* at 230 (citing 18 U.S.C. § 2119 (Supp. V 1988)), § 111(b) increases the maximum penalty to twenty years, up from the one or eight years imposed by § 111(a), 18 U.S.C. § 111(b). Further, like the aggravating facts of serious bodily injury or death at issue in *Jones*, *see Jones*, 526 U.S. at 230, § 111(b) requires proof of either use of a dangerous weapon or infliction of bodily injury, which, as several of our sister circuits have held, "are of the type that the states and the federal government traditionally have considered elements of an

offense rather than sentencing factors." *United States v. Chestaro*, 197 F.3d 600, 608 (2d Cir. 1999); *see also United States v. Hathaway*, 318 F.3d 1001, 1007 (10th Cir. 2003); *United States v. Campbell*, 259 F.3d 293, 299 (4th Cir. 2001). Thus, the "look" of what is now § 111(b) is insufficient to support the conclusion that Congress intended its aggravating facts to be only sentencing provisions.

Nor does Congress's labeling of § 111(b) with the descriptor "Enhanced penalty" save *Young*'s analysis. As our en banc court recognized in *United States v. Buckland*, 289 F.3d 558 (9th Cir. 2002) (en banc), relying on such labels to infer congressional intent may be misleading, requiring a "conceptual pigeon-holing" that Congress intended *sub silentio* that sentence-enhancing factors such as those in § 111(b) be found by the judge rather than the jury. *Id.* at 565-66. Instead, we held that "[t]he days of semantical hair splitting between 'elements of the offense' and 'sentencing factors' are over," and that "[t]o the extent that our case law holds to the contrary, it is overruled." *Id.* at 566 (citation omitted).

**[14]** Indeed, *Buckland* is particularly applicable to the facts of this case. In *Buckland*, we considered a facial challenge to a portion of the Controlled Substances Act, 21 U.S.C. § 841, on the ground that, as pre-*Apprendi* decisions of our court had held, Congress intended the judge, rather than the jury, to make certain sentence-enhancing determinations concerning drug quantity. *Id.* at 563-64. We rejected the assumption that "we are bound by our pre-*Apprendi* holdings" on the matter, *id.* at 567 ("*Apprendi*'s reading of the Due Process Clause has stripped these holdings of precedential value."), and instead heeded the Supreme Court's instruction "that 'every reasonable construction must be resorted to, in order to save a statute from unconstitutionality,' " *id.* at 564 (citing *Hooper v. California*, 155 U.S. 648, 657 (1895)). We found dispositive the fact that, in contrast to the state statute at issue in *Apprendi*, which expressly provided that the sentencing enhancement be imposed by the trial judge by a preponderance of the evi-

dence, Congress did not specify in § 841 whether the judge or the jury would determine the drug quantity facts at issue. *Id.* at 565 (citing *Apprendi*, 530 U.S. at 468). Thus, we refused to read into the statute a congressional intent to "remove from the jury the assessment of the facts necessary to increase the prescribed range of penalties to which a criminal defendant is exposed." *Id.* at 566-67 (internal quotation marks, brackets, and citation omitted). And because the appellant failed to identify any persuasive legislative history to the contrary, we held that we were obliged to construe the statute so as not to violate *Apprendi*. *Id.* at 567.

**[15]** As in § 841, Congress did not specify in § 111(b) whether the aggravating facts would be found by the judge or the jury or by what standard of proof. Vela, however, fails to provide persuasive legislative history suggesting that Congress "purposely remov[ed] from the jury" the responsibility to decide whether a defendant, in violating § 111, used a deadly or dangerous weapon or inflicted bodily injury. *Id.* at 566-67 (internal quotation marks and citation omitted). As in *Buckland*, we consider a construction of § 111 consistent with *Apprendi* to be "fairly possible," and thus "we are obliged to so construe it." *Id.* at 567. We conclude, therefore, that *Young* has been effectively overruled to the extent that it is inconsistent with this opinion.

**[16]** Our conclusion resolves what otherwise might be viewed as a conflict between *Young* and our recent opinion in *United States v. Chapman*, 528 F.3d 1215 (9th Cir. 2008). In *Chapman*, we observed that the Supreme Court in *Jones* established "that where a statute sets out separate punishment clauses, each adding further elements to the crime, the punishment clauses constitute separate and distinct criminal offenses, rather than one offense with different punishments." *Id.* at 1218 (citing *Jones*, 526 U.S. at 252). We joined a number of our sister circuits in holding that, in accordance with *Jones*, § 111 must be construed to create three distinct criminal offenses, with § 111(a) containing one misdemeanor and

one felony and § 111(b) containing a second felony. *Id.* at 1218. If § 111(b) is itself a separate criminal offense, it follows that one of the offense elements is a finding of either use of a deadly and dangerous weapon or infliction of bodily injury, which is consistent with *Apprendi*.

For all of these reasons, we reject Vela's facial challenge to § 111 and hold that the district court properly refused to dismiss Count 2 of the superseding indictment.

## CONCLUSION

Although we conclude that we have jurisdiction to entertain Vela's appeal from the judgment of not guilty by reason of insanity, none of his contentions on the merits succeeds. Accordingly, the judgment is

## AFFIRMED.

---

N.R. SMITH, Circuit Judge, dissenting:

The Supreme Court has been clear: "In a criminal case the [final judgment] rule prohibits appellate review until conviction and imposition of sentence." *Flanagan v. United States*, 465 U.S. 259, 263 (1984) (citing *Berman v. United States*, 302 U.S. 211, 212 (1937)). In this case, there was no conviction or imposition of sentence and, thus, no appealable final judgment. Therefore, we have no jurisdiction to review this appeal. I must then dissent from today's holding to the contrary.

Knowing this to be the precedent, the majority has cited a string of cases holding that, because a finding of "not guilty by reason of insanity" brings a criminal proceeding to a practical end, we can treat such a verdict as a final judgment for purposes of appeal. Maj. Op. 17781-82. These cases are irrel-

evant. I do not dispute that a "not guilty by reason of insanity" verdict brings a "criminal proceeding . . . to an end and [that] no criminal sentence will follow." Maj. Op. 17781. The relevant focus, however, is not simply on whether the criminal proceeding has come to an end, but rather on whether it resulted in a *conviction* and *imposition of sentence.*[1] *Flanagan*, 465 U.S. at 263.

Far from this case ending in a conviction and sentence, it ended in an acquittal. It goes without saying that a criminal defendant may not appeal his acquittal. Not only does a contrary position conflict with the Supreme Court's instruction that there can be no appeal until there is a conviction and a sentence, it defies basic notions of appellate review. Indeed, in criminal cases that result in acquittal, not even the losing party—i.e., the government—has an absolute right to appeal. *See United States v. Scott*, 437 U.S. 82, 84-85 (1978) ("The Court has long taken the view that the United States has no right of appeal in a criminal case, absent explicit statutory authority.") (citing *United States v. Sanges*, 144 U.S. 310, 312 (1892)).[2] The majority's strained efforts to distinguish *Flanagan*, therefore, are unavailing.

In fact, there is no reason to distinguish *Flanagan* here, because a close review of this case highlights the soundness of its holding. Vela won on a defense that he chose; at trial, he got the exact result for which he asked. The majority, how-

---

[1]Alternatively, the majority holds that there can be a final judgment in a criminal case, even in the absence of a sentence. Maj. Op. 17780 n.3. This argument is irrelevant, because in Vela's case there was no conviction *or* sentence.

[2]The majority contends that "Vela . . . is not directly attacking his verdict of not guilty by reason of insanity," but rather is "arguing that errors were made in the district court that deprived him of a proper opportunity to be freed entirely from his indictment." Maj. Op. 17783-84. Therefore, according to the majority, Vela is not actually appealing an acquittal. It makes no difference what aspect of the trial Vela is attacking, because Vela is nonetheless attacking a judgment that ended in an acquittal.

ever, now crafts a rule, whereby Vela may backpedal out of his decision to pursue a "not guilty by reason of insanity" defense. Allowing such "second-guessing" of defendant's trial strategy both undermines the nature of our adversarial system and diminishes the importance of the "not guilty by reason of insanity" defense.

At trial, Vela wanted to pursue a diminished capacity defense ("DCD"), which the district court disallowed. When it became clear that the district court was not going to allow the DCD, Vela had a choice: (1) he could pursue a general "not guilty" theory, knowing that he would be able to challenge the district court's DCD ruling (and any of its other rulings) on direct appeal; or (2) he could raise other affirmative defenses, which, if successful would result in exoneration. Vela opted for the second choice, and succeeded. Notwithstanding his acquittal, Vela now prefers to have been acquitted under a DCD (because, of course, he could then avoid commitment in a mental institution). Thus, he seeks review in this court, which the majority has now granted him.

Rather than enforcing the consequences of Vela's trial strategy, today's holding will convert appellate courts into a form of insurance coverage, eliminating risks associated with the parties' strategic trial decision to pursue the "not guilty by reason of insanity defense," thereby hampering society's interest in the limited invocation of that defense. Had Vela been uncomfortable with the implications of a "not guilty by reason of insanity" verdict, he was certainly free to not pursue it. But he chose to pursue it, with all of its attendant risks. Now Vela wants to have his cake and eat it too by appealing one failed affirmative defense, while keeping his acquittal verdict as a back up.[3] We ought not act as a guarantor against

---

[3]On this note, it remains unanswered what happens with a jury's prior verdict of "not guilty by reason of insanity," if, on remand, the jury rejects the defendant's DCD. Because neither this court nor any other has previously held that a criminal may appeal an acquittal by reason of insanity,

defendant's strategic trial decisions. To do so here would dilute the difficult choice any defendant considering a "not guilty by reason of insanity" defense must make. *See Curry v. Overholser*, 287 F.2d 137, 139-40 (D.C. Cir. 1960) ("Having . . . elected to make himself a member of that 'exceptional class' of persons who seek verdicts of not guilty by reason of insanity, he cannot now be heard to complain of the statutory consequences of his election." (internal citation omitted)).

In the end, we are left with a holding that will allow defendants to second-guess their strategic trial decisions. I cannot think of any other example (nor can the parties or the majority point me to any) in our adversarial system where we allow a litigant to back out of such a strategic trial choice, especially one that is ultimately successful. *See, e.g., Wainwright v. Sykes*, 433 U.S. 72, 95 n.2 (1977) (Stevens, J., concurring) ("[A]ssuming the lawyer's competence, the client must accept the consequences of his trial strategy.") (quotation marks and citation omitted); *United States v. Gonzalez*, 897 F.2d 1018, 1021 (9th Cir. 1990) (holding that a criminal defendant must accept the sentencing consequences "of a trial strategy of denying culpability"); *United States v. Hamilton*, 208 F.3d 1165, 1168 (9th Cir. 2000) (noting that a defendant must "make an informed decision about whether or not to plead guilty," in order to understand the potentially adverse consequences of such action).[4] Given today's holding, we ought not

there is no authority to guide a district court. A district court must choose whether to, for example, 1) have a completely new trial, 2) allow the defendant to conditionally plead not guilty by reason of insanity subject to success on the DCD, or 3) retain the acquittal while retrying the DCD. This lack of guidance further undermines the feasibility of the majority opinion.

[4]Not even in the "ineffective assistance of counsel" context is a criminal defendant allowed to second-guess strategic trial decisions. In examining "ineffective assistance of counsel" claims, we follow the familiar two-step

act surprised if a defendant, after taking the stand on his behalf and realizing that the cross-examination went rather poorly, simply turns to the judge and requests a "re-do."

Enforcing the consequences of a litigant's trial strategy is not simply born out of a desire to perpetuate certain aspects of our adversarial system, it also furthers important policy goals. The "not guilty by reason of insanity" defense was constructed as a way to balance the dual societal interests in deterring bad behavior while punishing only those that are morally culpable. *See Powell v. Texas*, 392 U.S. 514, 536 (1968) ("The doctrines of actus reus, mens rea, insanity, mistake, justification, and duress have historically provided the tools for a constantly shifting adjustment of the tension between the evolving aims of the criminal law and changing religious, moral, philosophical, and medical views of the nature of man."). Where a defendant successfully pursues a "not guilty by reason of insanity" defense, that defendant is found to lack moral culpability—an extreme result that can be upsetting to society. *See, e.g.*, *Commonwealth v. Trill*, 543 A.2d 1106, 1116'18 (Pa. Super. Ct. 1988) (detailing episodes of public outcry over various courts' uses of the insanity defenses). It is only reasonable, therefore, that society has an interest in making this defense available to only the truly insane. It makes sense that a defendant would have to make a difficult choice in pursuing a "not guilty by reason of insanity" defense, because it is, in fact, a dramatic remedy. By mitigating the effects of that choice (which I believe allowing jurisdiction in this case would do), we frustrate that balance.

---

process outlined in *Strickland v. Washington*, 466 U.S. 668 (1984). Under the first step, we examine whether counsel's performance was deficient. *Id.* at 689. But even then, we are not allowed to "second-guess counsel's assistance." *Id.* Rather, we are limited to determining whether counsel's strategy was *reasonable*, instead of looking at what counsel *could* have pursued. *Siripongs v. Calderon*, 133 F.3d 732, 736 (9th Cir. 1998). Thus, not even does our "ineffective assistance of counsel" jurisprudence allow a defendant to back out of his (or his attorney's) strategic trial choices.

This is not to say that Vela has no opportunity to challenge his commitment. Because an individual committed to a mental institution is being "detained," Vela may always file a petition for a writ of habeas corpus under 18 U.S.C. § 4247(g). Moreover, Vela may appeal the district court's subsequent commitment order as an appealable final order. *See United States v. Stewart*, 452 F.3d 266, 272 (3d Cir. 2006) ("[We] hold that a district court's § 4243(e) order committing an individual to the Attorney General's custody after his acquittal by reason of insanity is an appealable final order under § 1291."). I understand, of course, the higher standard of review associated with habeas challenges. I also understand that Vela may not be able to raise all the same arguments in a habeas challenge that he raises here. Nevertheless, those are the remedies that the Constitution and Congress have outlined to make available to persons in Vela's position.

The habeas statute, which explicitly allows committed persons to challenge their detention, proves that there is a scheme already in place to treat people in Vela's position. Claiming insanity is a significant risk, to be sure. If the defense loses, the defendant faces a criminal sentence. But even if the defense succeeds, the defendant faces detention in a mental institution. To prevent illegal detentions, Congress specifically dictated that "[n]othing contained in section 4243, 4246, or 4248 precludes a person who is committed under either of such sections from establishing by writ of habeas corpus the illegality of his detention." 18 U.S.C. § 4247(g). The majority's rule would seem to violate the spirit of this congressional scheme, if not the letter of it, by essentially holding that the habeas remedy already in place is simply not good enough. I see no reason for creating a new jurisdictional rule to allow defendants like Vela to circumvent the system already in place.

Based on these considerations and the Supreme Court's unequivocal instruction that there can be no "appellate review until conviction and imposition of sentence," *Flanagan*, 465

U.S. at 263, I dissent from the majority's holding that this court has jurisdiction to hear his appeal.